## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERT E. GUCKER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  13-583 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| U.S. STEEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Presently before the Court is the Motion to Mold the Verdict to Conform to the Statutory Cap (Docket No. 185) filed by U.S. Steel Corporation ("U.S. Steel" or "Defendant") following a jury trial in which judgment was rendered in favor of Albert E. Gucker ("Plaintiff") pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, *et seq.* ("PHRA").  Defendant requests that the Court reduce the jury's award of $550,000.00 in compensatory damages and $5,000,000.00 in punitive damages (Docket No. 182) to conform with the statutory cap in 42 U.S.C. § 1981a(b)(3)(D). After careful consideration of the parties' positions, the evidence of record, and pertinent statutory and case law, the Court GRANTED Defendant's Motion, in part, and DENIED, in part. (Docket No. 249).

II.   **FACTUAL & PROCEDURAL BACKGROUND**

A.   Plaintiff's Career at U.S. Steel

Upon graduation from high school, Plaintiff went to trade school at the U.S. Steel Duquesne Works for approximately three years.  (Docket No. 211 at 81:21-25).  In 1971, he began working for the company as a laborer at the Irvin Works.  (Docket No. 211 at 82:15-20). During his career, he had a series of promotions: first to millwright helper; then to millwright apprentice; and finally, to millwright.  (Docket No. 211 at 83:3-25).  As a millwright, he was an equipment mechanic in the mill.  (Docket No. 211 at 84:1-2).

Plaintiff eventually became an equipment repairman in the Irvin Works tractor shop, where he worked for approximately fifteen (15) years.  (Docket No. 211 at 84:8-11, 84:23-24). The tractor shop took care of all of the mobile equipment in the plant.  The equipment repairman position was substantially the same as Plaintiff's millwright position in the mill, but he was responsible for servicing different types of equipment.  (Docket No. 211 at 84:14-16). Plaintiff serviced forklifts, rams, tow motors, and equipment that moved heavy coils.  (Docket No. 211 at 84:18-19; 213 at 230:12-17).  It was important for the tractor shop workers to quickly fix and service equipment, so that the facility did not have to be shut down.  (Docket No. 213 at 231:13-16).

B.   Plaintiff's Medical Restrictions

Plaintiff had medical restrictions for at least ten (10) years due to his arthritic knees. (Docket Nos. 211 at 87:25, 101:20; 213 at 10:4-6).  Specifically, he was not to lift anything heavier than thirty (30) pounds and was not to climb more than ten (10) steps.  (Docket No. 211 at 87:20-24).  Plaintiff also has atrial fibrillation, for which he takes medication.  He believed that U.S. Steel was aware of this condition.  (Docket No. 211 at 102:3).  Due to his restrictions,

Plaintiff was issued a parking pass.  (Docket No. 211 at 98:17-20; Joint Exhibit 48, Drive-In Pass Approval).

Plaintiff was capable of performing his duties as a mechanic in the tractor shop, and was never cited for poor work performance.  (Docket No. 211 at 99:9-15).  There were no tasks that were essential to his job that he was unable to perform; neither were there any tasks that he refused to do.  (Docket No. 211 at 99:18; 100:3, 15-24).  He was sometimes asked to lift an object that was fifty (50) pounds, but in such instances it was a two-person job that he could complete with a coworker.  (Docket No. 211 at 200:19-24).

    C.  <u>Gallbladder Surgery</u>

During the fall of 2011, Plaintiff was on medical leave while recovering from gallbladder surgery.  (Docket Nos. 211 at 86:9-11, 94:4; 212 at 104:24).  Plaintiff informed his doctors that he felt ready to return to work near the end of December 2011.  (Docket No. 211 at 114:4-7).  Plaintiff's surgeon, Dr. Brent Angott, released him to return to work on December 27, 2011.  (Docket No. 211 at 94:5-18).  He did not have any new restrictions as a result of his gallbladder surgery. (Docket No. 213 at 18:10).

    D.  <u>Events of December 28, 2011</u>

Plaintiff reported to the mill on December 28, 2011.  (Docket No. 211 at 85:1-3, 89:13-15).  That morning, he was required to submit to a physical by Dr. Richard Katz ("Katz"), a U.S. Steel physician employed by Workwell Corporation at the Irvin Works.  (Docket Nos. 211 at 94:22-95:4; 213 at 122:15, 124:13-25, 125:11).  The assessment lasted approximately five (5) to ten (10) minutes.  (Docket No. 213 at 128:11-14, 129:15-18).  Katz observed that Plaintiff underwent laparoscopic surgery, was on no new medications, and was released by his surgeon to

return to full duty.  (Docket No. 213 at 130:1-3).  Examination results did not change Plaintiff's previous medical restrictions.  (Docket No. 213 at 148:10).

Katz cleared Plaintiff to return to work.  (Docket No. 211 at 95:9-25).  The form that showed that Plaintiff was able to return to work indicated that he had a medical restriction of not lifting thirty (30) or more pounds.  (Docket No. 211 at 97:23).  This was the same restriction that had been in place for at least ten (10) years before his leave. (Docket No. 213 at 10:4-7).  Plaintiff thereafter resumed his normal duties.  (Docket No. 211 at 114:16-24).  Plaintiff worked for approximately five (5) hours.  (Docket No. 211 at 121:2-3).  There were no workplace incidents during that time.  (Docket No. 211 at 115:3).

Later that morning, Ashley Ligman (née Ashby) ("Ligman"), the maintenance manager of the tractor shop who had been Plaintiff's supervisor for approximately three (3) years, noted Plaintiff's medical return to work form on her desk.  (Docket Nos. 211 at 102:18; 213 at 218:3-5).  After seeing that the form contained work restrictions, she took it to her supervisor, Don Hubert's ("Hubert") office and left it on his desk.  (Docket No. 213 at 218:6-8).

Hubert was the area manager of central maintenance.  (Docket No. 211 at 85:7-11).  In that position, he oversaw maintenance for the entire plant.  (Docket No. 213 at 229:12-14).  He supervised approximately fifty (50) to one hundred (100) employees. (Docket No. 213 at 238:7-9).  In addition to the tractor shop where Plaintiff worked, he also oversaw the electrical repair shop, the machine shop, and the refrigeration shop.  (Docket No. 213 at 230:5-23).  Hubert had been in his position for approximately three (3) months.  (Docket No. 211 at 86:9, 102:20).  He had access to the employees' return-to-work slips in each employee's file, but he stated that they were not something that he would seek out.  (Docket No. 214 at 24:16-20, 25:1-7).  However, Ligman testified that Hubert had told her and the other central maintenance supervisors that

when employees came to work with restrictions, he wanted to see them.   (Docket No. 213 at 218:19-219:1).

Hubert called Ligman into his office, where they spoke about Plaintiff's medical slip and the lifting restriction of thirty (30) pounds.  (Docket Nos. 213 at 218:9-10; 214 at 27:20-21).  He informed her that he wanted to speak to Plaintiff about the restriction.  (Docket Nos. 213 at 218:9-10; 214 at 28:5-6).   She was present when Plaintiff was called into Hubert's office. (Docket No. 211 at 85:15-20, 117:4).  Per Plaintiff, Hubert told him that he had a problem and that nobody in his department works with limitations or restrictions.[1]  (Docket No. 211 at 85:23-86:1, 119:24).  In contrast, Hubert testified that Plaintiff discussed all of his medical conditions with him.   In reply, he told Plaintiff that he was not sure if he could accommodate his restrictions.  (Docket No. 214 at 28:5-14).  Hubert maintained that Plaintiff could not perform the major functions of his tractor shop position safely.   (Docket No. 214 at 29:4-5, 29:15-22). Hence, Hubert stated that Plaintiff had to have the restrictions removed before he was able to return to work in the department.[2]  (Docket Nos. 211 at 86:1-3; 214 at 28:9-11).

Plaintiff testified that Hubert informed him that he had to leave the property.  (Docket No. 211 at 86:4-5).  Yet, Hubert said he told Plaintiff to go to the plant hospital.  (Docket No. 214 at 32:17-18). Before leaving Hubert's office, Plaintiff shook Hubert's hand; told him to have a pleasant day; and thanked him for helping him to make a decision.  (Docket Nos. 211 at 86:5-6; 214 at 33:4-5).  During their conversation, Hubert said he never expressed to Plaintiff that he was fired.  (Docket No. 211 at 149:14-18).  Ligman indicated that she would be getting back in touch

---

[1]      Hubert testified that he could only remember one employee with restrictions who worked for him.  (Docket No. 213 at 241:7-16).  That employee worked in the hot mill and had to leave for knee surgery.  He then had a limitation that limited excessive standing or walking.  (Docket No. 213 at 241:9).  He later recalled another employee who could not wear metatarsal boots, which were required in the plant.  (Docket No. 213 at 242:5-6). However, her job did not require her to go inside the plant.  (Docket No. 213 at 242:16-17).
[2]      The conflicting evidence presented issues of credibility for the jury.

with Plaintiff.  (Docket No. 211 at 250:10-12).   However, Plaintiff was never contacted by Ligman or anyone else about the possibility of working again at U.S. Steel.  (Docket Nos. 211 at 250:8; 218 at 143:18-21).

After the conversation with Hubert, Plaintiff went to his locker and changed, and then was escorted to the main gate by security, which rattled him.  (Docket No. 211 at 88:5-7, 89:12-13).  Plaintiff considered this to be an indication that his employment at U.S. Steel was being terminated.  (Docket No. 211 at 106:15-17, 150:17-19).  His understanding was based on his experience seeing other employees, including hourly employees and management, being escorted off the worksite.[3]  (Docket No. 211 at 196:22-197:2).  Thus, he did not believe that he was permitted to return to work the next day.  (Docket No. 211 at 106:25).

Plaintiff subsequently went to the mill hospital to see if he could get his restrictions removed and/or obtain additional information, but was unsuccessful. (Docket No. 211 at 88:7-14, 121:22, 153:14).  When he went to the hospital, he claims he was not examined, and was never again examined by a U.S. Steel doctor.  (Docket No. 211 at 104:6-14).  Upon leaving the hospital, he went to the union hall, where he spoke to union representative Dave Novak ("Novak").  (Docket No. 211 at 89:17-25, 107:15, 154:13-14).  He then went home, where he told his wife that he "was in limbo." (Docket No. 211 at 90:11, 107:18-19).

Lauren Coulter (née Beausigneur) ("Coulter") became involved in Plaintiff's case after Hubert had decided to no longer accommodate Plaintiff's restrictions and sent him home on December 28, 2011.  (Docket No. 212 at 25:15, 32:7).  Coulter worked in labor relations and handled employee grievances, including those under the EEOC, ADA, and ADEA.  (Docket No. 212 at 27:8-9).  Coulter was assigned Plaintiff's file.  (Docket No. 212 at 38:9).  It was her job to

---

[3]      Lauren Coulter, who as discussed below, was terminated by U.S. Steel, was escorted from the plant by security on that day.  (Docket No. 212 at 27:22-23).

determine whether U.S. Steel had acted appropriately towards Plaintiff.  (Docket No. 212 at 39:8).

Hubert went to see Coulter sometime after lunch on December 28, 2011, regarding Plaintiff.  (Docket No. 213 at 8:25, 57:7).  Coulter recalls Hubert was frustrated.  (Docket No. 213 at 9:4-5).  Krista Marcin ("Marcin"), who was manager of labor relations and Coulter's boss, also joined them.  (Docket Nos. 213 at 9:9, 11:20, 52:10; 215 at 49:4, 52:1).  During the meeting, Hubert relayed the previous events of the day, including that he was no longer accepting Plaintiff's restrictions.  (Docket No. 213 at 9:25-10:11).  Coulter inquired why he was not accepting Plaintiff's restrictions after they had been accepted for almost ten (10) years, to which Hubert answered that he was simply not accepting them anymore.  (Docket No. 213 at 11:12-16).  Coulter recalls Marcin was shocked at Hubert's answer.  (Docket No. 213 at 11:23).  Her impression was that the labor relations team was left to "fix" the situation.  (Docket No. 213 at 12:10-11).

Marcin recalled the events differently.  She stated that when Hubert came into Coulter's office, he said that he learned that there were a variety of issues that could potentially interfere with Plaintiff's ability to perform his job.  (Docket No. 215 at 52:25-53:3).  During the meeting, Hubert stated that he had sent Plaintiff to medical to be evaluated.  (Docket No. 215 at 53:4-11).  Marcin testified that her response to Hubert was that his actions were appropriate.  (Docket No. 215 at 53:21-25).  She also disagreed with Coulter's determination that the labor relations team was left to "fix" the situation.  (Docket No. 215 at 54:15-19).  When asked if there had been good faith participation in the interactive process, Marcin responded that "it could have been better."  (Docket No. 215 at 90:18-22).  However, Marcin stated that there were no available

positions to give Plaintiff that would have accommodated his restrictions.  (Docket No. 215 at 58:2-6).

     E.  Plaintiff's Response to the Events of December 28, 2011

In response to his conversation with Novak, Plaintiff contacted the Social Security Administration.  (Docket No. 211 at 93:22-23).  His purpose was to find out what he would need to do if he wanted to go on Social Security Disability.   (Docket No. 211 at 108:4-10). Ultimately, Plaintiff applied for Social Security Disability, and in his application he listed as impairments his knees, heart condition, lower back, right foot, and borderline diabetes.  (Docket No. 211 at 124:25-125:6).  He also noted age as a reason why he stopped working, because he believed that Hubert "leaned on him" the way he had leaned on others in central maintenance. (Docket No. 211 at 194:10-19).

Plaintiff also filed for unemployment compensation, which was contested by U.S. Steel. (Docket No. 211 at 109:2, 109:15).  In his application for same, Plaintiff said that he was not able to do his job because U.S. Steel had told him that he was not able to work.  (Docket No. 211 at 109:10).  Plaintiff maintained he would have been willing to accept any job from U.S. Steel. (Docket No. 211 at 109:18).  He continued to be on the company's vacation schedule, and received vacation benefits that he had accumulated as per the union contract.  (Docket No. 211 at 112:24-113:10).  Plaintiff applied for Sickness and Accident benefits, because that was what he had previously done when he was out while recovering from his gallbladder surgery.  (Docket No. 211 at 109:24-110:2).  U.S. Steel denied them.  (Docket No. 211 at 110:5-7).

Plaintiff ultimately filed an ethics complaint against Hubert because he believed that he was unjustly and unfairly removed from his position in the tractor shop pursuant to U.S. Steel

policy.[4]  (Docket No. 211 at 110:16-18).  U.S. Steel denied his complaint.  (Docket No. 211 at

110:24).  He then verbally complained to his union.[5]  (Docket No. 211 at 158:1-6).  He told the

union representative that he had been unfairly taken off the floor and that he was told to change

his restrictions.  (Docket No. 211 at 162:9-12).  It is not clear what action, if any, was taken by

the union.

   F. <u>U.S. Steel's Response to the Events of December 28, 2011</u>

   After developing an investigation plan with Marcin, Coulter interviewed Ligman, spoke

to representatives in the medical department, and then set up a functional capacity exam for

Plaintiff.  (Docket No. 213 at 13:1-2, 14:13-16, 15:4-6).  The functional capacity exam, a type of

job analysis, was conducted by Mark Kerestan ("Kerestan") – a physician assistant and physical

therapist.  (Docket No. 213 at 14:14-16).  Kerestan works at Orthopedic and Sports Physical

Therapy Associates, which was hired by U.S. Steel to perform various services, including on-site

services.  (Docket No. 214 at 126:4-6, 126:25-128:4).  Kerestan, in performing work for

Defendant, used a computer owned by U.S. Steel, which he no longer had after his firm's

contract with the company ended.  (Docket No. 214 at 184:1-20).  He also had a U.S. Steel email

address.  (Docket No. 214 at 208:1-5).

   Before seeing Plaintiff to conduct the functional capacity exam, Kerestan created a job

description for his tractor shop position, (Docket No. 213 at 20:9), as one had not previously

been done.  (Docket No. 214 at 208:9).  The purpose of the job analysis was to see what Plaintiff

would be doing on a day-to-day basis.  (Docket No. 213 at 20:16-19).  When performing a job

evaluation, Kerestan would typically look at the job, visit the department where the work took

---

[4]  Plaintiff acknowledged that, per U.S. Steel policy, he could have complained to a company committee. (Docket No. 211 at 162:1-4).  Plaintiff testified that he equated "unfair" treatment with "discrimination."  (Docket No. 211 at 162:9-163:14).

[5]  The proposed exhibits and those presented at trial do not document Plaintiff's complaint to his union.

place, and meet with a supervisor.  (Docket No. 214 at 132:16-18).  He would then go to the

plant, observe workers doing their jobs, draft a job description, send the draft to a company

supervisor for a review, and then discuss the draft with the supervisor and make revisions.

(Docket No. 214 at 132:17-133:12).   After both parties signed off on the job description, it

became official.  (Docket No. 214 at 133:12-14).  Here, Kerestan documented the job's essential

functions, general work description, overall physical demand, and any special safety equipment

that needed to be worn when performing the job.  (Docket No. 214 at 140:8-15).

When Kerestan visited the tractor shop, Hubert, Coulter, and Ligman were present.

(Docket No. 213 at 20:8-14).  Kerestan examined the type of work Gucker would do on a day-to-

day basis, while receiving directions from Hubert.  (Docket No. 213 at 20:16-19).   Kerestan

asked Ligman questions, but did not question other employees.  (Docket No. 213 at 20:23-25).

Throughout the process, Kerestan took notes.  (Docket Nos. 213 at 20:20-21; 214 at 138:21-24).

After preparing a draft, Kerestan emailed it to Hubert for his review.  (Docket No. 214 at 143:17-

20).

A representative from U.S. Steel called Plaintiff to arrange for him to see Kerestan in

Washington, Pennsylvania, to undergo a functional capacity examination.  (Docket No. 211 at

156:3-7, 167:10-17).  Plaintiff knew that he was going to be tested, but was not sure what the test

would involve.  (Docket No. 211 at 156:10-12).  He willingly took the test because he wanted to

return to his job at U.S. Steel.  (Docket No. 218 at 143:25).

Plaintiff met with Kerestan on January 18, 2012.  (Docket No. 211 at 171:23-24).   When

they met, Plaintiff indicated that he had right ankle and lumbar pain, his left knee pain was

greater than his right knee pain, and he had numbness associated with his ankle pain.  (Docket

No. 211 at 171:25-173:16). He also stated that his left knee was "shot." (Docket No. 211 at 174:9-12).

Kerestan put Plaintiff through a physical fitness test, during which he had to lift objects, bend, and perform other dexterity tests. (Docket No. 211 at 175:17-25). He also had to run up and down steps, where he experienced a rise in his heart rate. (Docket No. 211 at 176:1-9). In all, the examination took approximately three (3) hours. (Docket No. 214 at 233:5-6). Upon completion of the exam, Kerestan rated Plaintiff fit for only sedentary work. (Docket No. 211 at 177:4-12).

The primary reason that Kerestan rated Plaintiff fit for sedentary work was his elevated heart rate. (Docket No. 214 at 233:13-15). In making his determination, Kerestan used a lower passing heart rate since Plaintiff had told him that he was on a beta blocker. (Docket No. 214 at 243:2-20). Yet, Plaintiff did not take his medication the day of the examination, (Docket No. 214 at 247:2-3), something that Kerestan knew as it was referenced in his report. (Docket No. 214 at 251:7-9). Kerestan also knew that Plaintiff always had a normal heart rate during his U.S. Steel physicals. (Docket No. 214 at 248:14).

Plaintiff eventually received a copy of Kerestan's report approximately two (2) to three (3) weeks after the exam. (Docket No. 211 at 168:19-24). He disagreed with the sedentary rating. (Docket Nos. 211 at 179:17; 218 at 144:6).

G. Plaintiff's Decision to Retire

Ultimately, U.S. Steel never officially fired Plaintiff.[6] (Docket No. 211 at 111:4). He never received word about returning to work in any position. (Docket No. 211 at 111:4-10). By

---

[6]      These facts parallel what happened to another former U.S. Steel employee, Timmy Hopes ("Hopes"). Hopes testified that after he sustained an injury, there was a disagreement about whether he was discharged or quit his position at U.S. Steel. (Docket No. 216 at 83:4-9). The disagreement came after U.S. Steel did not agree to

March of 2012, Plaintiff came to the realization that he would not be returning to work at U.S. Steel when he stopped receiving his wages.  (Docket No. 211 at 111:21).  Plaintiff consequently spoke with Ed McGough ("McGough"), who was part of U.S. Steel's benefits team.  (Docket No. 211 at 112:5).  McGough informed Plaintiff that he would also be losing his health benefits on March 31, 2012.  (Docket No. 211 at 112:18-23).

Plaintiff recalled that McGough advised Plaintiff to retire and begin collecting his pension so he could have his medical benefits reinstated.  (Docket No. 211 at 115:20-22, 188:24-189:2).  Plaintiff needed these benefits for a knee replacement surgery scheduled for March 30, 2012.  (Docket No. 211 at 222:21-22).  As a result, Plaintiff decided to retire.  (Docket Nos. 211 at 113:16-23; 212 at 105:19; 218 at 66:7).

Carolyn Gucker accompanied her husband on the day that he signed his pension papers. (Docket No. 212 at 107:2).  She wanted to ensure that Plaintiff understood what he was signing because he does not read well.  (Docket No. 212 at 107:4-6).  The pension papers required that Plaintiff initial that he was retiring voluntarily.  (Docket No. 212 at 107:9-13).  He did not sign the papers until his wife asked him to, because he believed that he could still do his job and was willing to endure some pain to continue.   (Docket No. 212 at 107:11-19, 108:1, 126:12-13, 185:14-16).  She asked him to sign the papers because they "had been through so much . . . that [she] just wanted it to be done." (Docket No. 212 at 107:21-22).

H.  Plaintiff's Search for Other Work

Plaintiff did not look for employment between December 28, 2011 and March 31, 2012, (Docket No. 211 at 231:11), because he was hoping that he could regain his job at U.S. Steel. (Docket No. 218 at 66:11-13).  He also could not work for three (3) months following his March

---

continue Hopes' modified duty.  (Docket No. 216 at 83:16-21).  He ultimately never worked for U.S. Steel again. (Docket No. 216 at 83:22-23).

30, 2012 knee surgery due to ongoing rehabilitation.  (Docket No. 218 at 83:24-84:18, 84:12-13).   However, by the time of trial, Plaintiff seemed to have completely recovered from his knee surgery.[7]

Following his knee rehabilitation, Plaintiff unsuccessfully applied to work as a mechanic at various places – including auto body shops and a bus garage – because he wished to continue working.  (Docket No. 218 at 66:15-25, 83:24-84:18, 114:23-115:2).   At the time of trial, Plaintiff was receiving a pension, as well as working part-time, four (4) or five (5) times a year, selling sweet sausage sandwiches at fairs, festivals, and special events in a business that he has operated for approximately thirty (30) years.  (Docket Nos. 211 at 82:2-10; 218 at 72:2-6).

I.   How U.S. Steel's Actions Affected Plaintiff

Plaintiff enjoyed his job as a U.S. Steel mechanic.  (Docket Nos. 211 at 111:1; 212 at 108:10-11; 218 at 53:17-19).  In fact, Plaintiff testified that he "loved it."  (Docket No. 211 at 111:1-2).  He was also proud to work for U.S. Steel due to its history.  (Docket No. 212 at 108:10-17).  He was friends with all of the workers in his shop.  (Docket No. 218 at 53:21-24).   They ate lunch together and joked around.  (Docket No. 218 at 54:1-3).   He was particularly close with "Bubba" Gille, Tom Amoroso, and Wesley Hanbury.  (Docket No. 218 at 54:4-13).   After his departure, Plaintiff tried to stay in touch with them by meeting for coffee, talking on the telephone, or fishing.   (Docket No. 218 at 55:4-6).   Nonetheless, he did not see them as frequently as before.  (Docket No. 218 at 55:8).

Plaintiff was ashamed when forced to speak about his situation to his coworkers and neighbors.  (Docket No. 218 at 55:11-56:4, 66:2-4).   Plaintiff was also hesitant to broach the subject with his children.  (Docket No. 218 at 143:3-6).  People noticed changes in Plaintiff and

---

[7]      While not heard by the jury, Donald Kirwan testified that in updating his expert report, he assumed, based on his experience, that Plaintiff's disability time following his knee surgery would have been three (3) months. (Docket No. 218 at 230:6-10).

were concerned.  (Docket No. 218 at 142:7-12).  On February 15, 2012, Plaintiff went to see his family doctor, Dr. King, about his mental state.  (Docket No. 218 at 69:19-23).  Plaintiff reported that he was depressed.  (Docket No. 218 at 70:1-4, 71:2-10).  He was under increased stress from the loss of his position and the perceived lack of direction in his life.  (Docket No. 218 at 71:10-13).  Dr. King prescribed Lexapro – and later Buspirone – to treat Plaintiff's anxiety through at least the date of trial.  (Docket No. 218 at 71:16-18, 146:13-16).  Although Plaintiff had experienced bouts of depression related to the death of his former fiancée from cancer (Docket No. 218 at 108:13-109:17), he had not been prescribed medication since 2006.  (Docket No. 218 at 115:13-17).

Mrs. Gucker described her husband as a man "whose job defines who he is."  (Docket No. 212 at 107:25-108:1).  She believed that working is very important to him.  (Docket No. 212 at 115:21).  In addition to being depressed after losing his job, she described him as angry, confused, frustrated, and sad.  (Docket No. 212 at 108:2-4).  He walked around the house in a "stupor" and did not know what to do with himself.  (Docket No. 212 at 108:6-8).  Mrs. Gucker – still working full-time – would often find Plaintiff to be in the same place as when she had left for work, as if he had not moved all day.  (Docket No. 218 at 141:14-18).  Normally he spent his free time working outside on vehicles, on a trailer, or cutting the grass. (Docket No. 218 at 141:22-23).

J.  Procedural History

Plaintiff filed his Complaint in this Court on April 23, 2013, alleging that his employment was unlawfully terminated due to age[8] and disability[9], in violation of the Age Discrimination in Employment Act ("ADEA"), the ADA, and the PHRA.  (Docket No. 1).  On January 2, 2015,

---

[8]    At the time of his termination, Plaintiff was sixty (60) years old. (Docket No. 55 at 71 ¶ 5).
[9]    Plaintiff suffered from degenerative arthritis in both knees and his right ankle, instability and numbness in the right foot due to spinal stenosis, type II diabetes, atrial fibrillation, and sleep apnea. (Docket No. 44 at ¶ 104).

Defendant filed a Motion for Summary Judgment (Docket No. 35), which the Court denied on June 12, 2015.  (Docket Nos. 56, 57).   This case subsequently went to trial on February 1, 2016. During the trial, Defendant made a Motion for Judgment as a Matter of Law Under Rule 50 (Docket No. 158), which the Court denied as to Plaintiff's ADA claim and granted as to Plaintiff's state and federal age discrimination claims.  (Docket No. 213 at 108:13-118:8).  After holding a charge conference, the Court instructed the jury on both the ADA and the PHRA.[10] (Docket No. 217 at 76-85).  During the conference, neither party asked that the jury charge or verdict forms distinguish between the ADA and the PHRA claims.  (Docket Nos. 178 and 182). Both the ADA and the PHRA disability claims went to the jury.   (Docket No. 217 at 76:20-77:5, 78:1-4, 79:13-17, 81:23-82:2, 85:3-9).

On February 11, 2016, at the conclusion of the first phase of the bifurcated jury trial, the jury found that Defendant was liable to Plaintiff for employment discrimination based on his disability.   (Docket No. 178).   Specifically, the jury found that Plaintiff proved by a preponderance of the evidence that:

1. "he is a qualified individual with a disability";

2. "U.S. Steel Corporation should have provided accommodation";

3. "U.S. Steel Corporation terminated him because of his disability or that he suffered an adverse employment action because of his disability"; and

4. "U.S. Steel Corporation terminated him because of his disability or that he suffered an adverse employment action because of his disability and that U.S. Steel Corporation had knowledge that it was violating the law or may have been violating the law."

---

[10]      In fact, adding language regarding the PHRA to the charge was specifically discussed during the charge conference.  (*See, i.e.,* Docket No. 217 at 14:6-7).

(Docket No. 178 at 1-2).  The jury also found that Defendant did not "prove by a preponderance of the evidence that accommodating Mr. Gucker's disability would not be possible because it would threaten his safety or the safety of others."  (Docket No. 178 at 1).

At the conclusion of the second phase of the trial on February 12, 2016, the jury awarded $550,000.00 in compensatory damages and $5,000,000.00 in punitive damages.  (Docket No. 182).  As the verdict form did not ask the jury to apportion damages between the ADA and the PHRA, damages were not apportioned.  Once the jury verdict was taken, Defendant made an oral motion to mold the verdict.  (Docket Nos. 183; 218 at 246:10-11).  Defendant subsequently filed its written Motion to Mold the Verdict to Conform to the Statutory Cap on February 16, 2016. (Docket No. 185).  A day later, Plaintiff responded to U.S. Steel's Motion and requested sanctions.[11]  (Docket Nos. 186 and 187).  The matter having been fully briefed (Docket Nos. 186 – 89, 193, 196, 205, 219), oral argument was held on April 8, 2016.[12] (Docket No. 205).  The Motion is ripe for disposition.

## III.  DISCUSSION

In its Motion, Defendant argues that any damages awarded to Plaintiff in the instant case should not exceed the $300,000.00 cap under the ADA.  (Docket No. 185 ¶¶12 – 14).  According to Defendant, the final charge provided to the jury at trial did not differentiate between the legal standards for finding liability under the ADA and under the PHRA.  While prior to January 1, 2009, actions arising under the ADA and the PHRA could be assessed under a coextensive standard, following passage of the ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 ("ADAAA"), the ADA and the PHRA require separate analysis.  Thus, because the standard applicable to the PHRA was never considered by the jury, the compensatory damages

---

[11]    This Memorandum Opinion only addresses Defendant's Motion to Mold. (Docket No. 185).  It does not address Plaintiff's Request for Sanctions, which remains pending. (Docket No. 186).
[12]    The transcript was prepared and filed on May 9, 2016.  (Docket No. 219).

available to Plaintiff are limited to those available under the relevant provisions of the ADA. (Docket Nos. 188 ¶¶ 11 – 13; 189 at 4 – 7; 196 at 2 – 4).

Plaintiff counters that, while the jury did not apportion damages between the ADA and the PHRA claims (Docket No. 186 ¶ 6), the ADA expressly prohibits any attempts to limit state law remedies.   (Docket No. 186 ¶¶ 11 – 12).   The PHRA does not provide a cap on compensatory damages.  (Docket No. 187 at 3).   Moreover, the most significant portion of the ADA standard altered by the ADAAA was in regards to finding "disability" under the act, and Defendant never contested Plaintiff's claim of disability at trial; therefore, because the remaining elements of the discrimination claims under the ADA and the PHRA remained largely the same pre and post-ADAAA, it was not error to provide the same jury charge for both statutes.  (Docket No. 193 at 6).

As an initial matter, the Court notes the ADA dictates that "'[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to…discharge of employees.'"  *Bielich v. Johnson & Johnson, Inc.*, 6 F.Supp.3d 589, 602 (W.D. Pa. 2014) (Conti, J.) (quoting 42 U.S.C. § 12112(a)).   "The PHRA similarly prohibits discrimination on the basis of disability."  *Id.* (citing 43 Pa. Stat. § 955(a)).   However, the ADAAA did increase the breadth of the term "disability" without an explicit concomitant enlargement by the Pennsylvania legislature for the PHRA. *Id.*

With the advent of the ADAAA, Congress intended to create a broad scope of protection. *Rocco v. Gordon Food Serv.*, 998 F.Supp.2d 422, 425 (W.D. Pa. 2014) (Conti, J.).   The ADA now requires a much "less searching analysis."   *Id.*   The definition of disability "'shall be construed in favor of broad coverage of individuals…to the maximum extent permitted.'"  *Sowell v. Kelly Serv., Inc.*, 139 F.Supp.3d 684, 698 (E.D. Pa. 2015) (quoting 42 U.S.C. §

12102(4)(A)).  Nonetheless, district courts in the Third Circuit are split with respect to whether the ADA standard and the PHRA standard continue to be coextensive.  *Rocco*, 998 F.Supp.2d at 428.

In the instant case, Plaintiff's disability was not contested by Defendant.  In fact, Defendant argued – ultimately without success – that Plaintiff was unable to return to work due to the restrictions stemming from his disabilities.  (Docket Nos. 211 at 37:16-19; 217 at 78:5-9).  Defendant fails to demonstrate to the Court how the remaining pertinent portion of the jury instruction regarding liability under the ADA is no longer coextensive with the PHRA:

> Second, he is a qualified individual able to perform the essential functions of a maintenance technician mechanic, labor grade 4 at U.S. Steel Corporation.
> Third, his disability was a determinative factor in U.S. Steel Corporation's actions or inactions.

(Docket No. 217 at 79).  *See Rocco*, 998 F.Supp.2d at 425 (quoting *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) ("To establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination.'").  The Court finds the ADA and the PHRA remain coextensive as to the above elements.  It must also be noted that the jury instructions regarding finding disability under the ADA and the PHRA were agreed upon by the parties.  (Docket No. 217 at 55).

Furthermore, as to the issue of "disability" itself, the ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment . . .

42 U.S.C. § 12102(1). The ADAAA did not change this definition.  Instead, it changed the way in which it was to be interpreted and applied. *Canfield v. Movie Tavern, Inc.*, 2013 WL 6506320 at *3 (E.D. Pa. Dec. 12, 2013) (citing 42 U.S.C. § 12102(3)(B)).  This Court's instructions were clearly derived from the above definition:

> Under the ADA, the term "disability" means a physical impairment that substantially limits a major life   activity.
>
> The term "physical impairment" means any condition that prevents the body from functioning normally. "Major   life activities" are activities that are of central   importance to everyday life. Major life activities include the operation of major bodily functions. I instruct you that walking, lifting, climbing, breathing and working are major life activities within the meaning of the ADA.
>
> Under the ADA, an impairment substantially limits a person's ability to walk, lift, climb, breathe and work if it prevents or restricts him from walking, lifting, climbing, breathing and working compared to the average person in the general population.
>
> ***
>
> The ADA's definition of disability includes not only those persons who are actually disabled, but also those who are regarded as having a disability by their employer.   The reason for this inclusion is to protect employees from being stereotyped by employers as unable to perform certain activities when, in fact, they're able to do so.
>
> Mr. Gucker is regarded as disabled within the meaning of the ADA if he proves any of the following by a preponderance of the evidence:
>
> Number one, he had a physical impairment that did not substantially limit his ability to perform the essential duties of the maintenance technician mechanic, labor grade 4 position, but was treated by U.S. Steel as having an impairment that did so limit his ability to perform these duties;
>
> Or, two, he had an impairment that was substantially limiting in his ability to perform the essential duties of his maintenance technician mechanic, labor grade 4 position only because of the attitudes of others towards said impairment;
>
> Or, three, he did not have any impairment, but U.S. Steel Corporation treated him as having an impairment that substantially limited his ability to perform the essential duties of his maintenance technician mechanic, labor grade 4 position.
>
> Also, Mr. Gucker can meet the requirement of being regarded as disabled if he was discriminated against because of an actual or perceived impairment, even if the impairment did not, or was not perceived to, limit a major life activity. Note that if a person is regarded as disabled and not actually disabled, an employer does not have an obligation to provide a reasonable accommodation.

(Docket No. 217 at 80:21-81:10, 82:3 – 83:9).[13]   The Court's instructions did not suggest a definition of disability under the ADA which was at odds with the definition under the PHRA, and there is no reason to suspect that the manner in which the jury analyzed whether Plaintiff was disabled in accordance with the ADA was at odds with their determination of disability under the PHRA.   Once again, Plaintiff and Defendant consented to the above language as applicable to finding liability under the ADA *and* the PHRA.   As a result, the Court finds that the standards pertinent to determining liability under the ADA and the PHRA – in this case – are coextensive.

The Court now looks to apportionment of damages and the statutory cap under the ADA. Under the ADA, the maximum amount of total compensatory and punitive damages allowed for a company of Defendant's size is $300,000.00.  42 U.S.C. § 1981a(b)(3)(D).[14]   The PHRA does not have a statutory cap for compensatory damages, but punitive damages are not authorized. *See e.g., Fadzen v. Pittsburgh Pub. Sch. Dist.*, 2013 WL 5703634, at *7 n.6 (W.D. Pa. Oct. 18, 2013) ("[P]unitive damages are not available against any defendant under the PHRA.") (citing *Hoy v. Angelone*, 720 A.2d 745, 749 (Pa. 1998)).   As the Supreme Court of Pennsylvania has stated, the PHRA is a remedial statute; as such, punitive damages are not consistent with its remedial purpose.[15]   *Hoy*, 720 A.2d at 749.

---

[13]     The language for this portion of the jury instructions comes from the Third Circuit Court of Appeals, Model Jury Instructions, § 9.2.1. *ADA Employment Claims – Disability* (2005).  The Model Jury Instructions language was jointly submitted by both parties in their proposed jury instructions.  (Docket No. 115 at 5).

[14]     (3) Limitations
The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—
. . .
(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.
42 U.S.C. § 1981a(b)(3).

[15]     While the ADA is also a remedial statute, punitive damages are expressly included in the statutory language.

Contrary to Defendant's argument, the ADA does not preclude Plaintiff from an award under the PHRA. To this end, section 12201(b) provides in relevant part, that:

> [n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

42 U.S.C.A. § 12201(b). Moreover, the Court of Appeals for the Third Circuit has directed district courts to maximize jury awards to plaintiffs. *See Gagliardo v. Connaught Lab., Inc.*, 311 F.3d 565, 570 – 71 (3d Cir. 2002). Specifically, the Court of Appeals held in *Gagliardo* that "a district court's obligation to uphold lawful jury awards whenever reasonable…supports the apportionment of damages between…state and federal claims." *Gagliardo*, 311 F.3d at 571 (citing *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 510 (9th Cir. 2000)). Apportioning a jury verdict in a way that maximizes the award to a plaintiff is proper because: (1) the ADA prohibits limiting state remedies; and (2) there is a policy to uphold reasonable jury verdicts. *Gagliardo*, 311 F.3d at 572. *Gagliardo* held:

> In sum, we hold that § 1981a does not prohibit apportionment of damages between claims, one under a capped federal statute and another under a corresponding uncapped state statute, so that the verdict winner gets the maximum amount of the jury award that is legally available. We base our holding on the ADA's explicit language which prohibits limiting state remedies, the policy of upholding reasonable jury verdicts, and the power of persuasive authority from two other circuit courts.

*Id*. at 572. The *Gagliardo* Court also ruled that:

> The fact that the PHRA does not contain a damages cap further indicates that it was intended to provide a remedy beyond its federal counterpart, the ADA. As the courts in *Passantino* and *Martini* recognized, subjecting such state law claims to the federal cap would effectively limit a state's ability to provide for greater recovery than allowed under the corresponding federal law. *Passantino*, 212 F.3d at 510; [*Martini v. Federal Nat. Mortg. Ass'n*, 178 F.3d 1336, 1349–50 (D.C. Cir. 1999)]. Imposing such a limitation would violate the federal law's prohibition on limiting state remedies. *Id.*

*Gagliardo*, 311 F.3d at 570-71.

The Court of Appeals has clearly recognized that the state's ability to provide for a greater recovery under state law should be permitted. Thus, allocation between the ADA and the PHRA was explicitly allowed in *Gagliardo*. *See also McKenna v. City of Phila.*, 2010 WL 2891591, at * 12 (E.D. Pa. July 20, 2010) (stating that "[a]ll of the decisions approving of…an apportionment…involve cases in which both capped and uncapped claims have been tried to a favorable verdict."); *E.E.O.C. v. Federal Express Corp.*, 537 F. Supp. 2d 700 (M.D. Pa. 2005). Defendant's argument that the PHRA played a minor role in the jury's verdict is unpersuasive.[16] (Docket No. 196 at 1, 4). The same could essentially be said of the ADA. The jury, having previously heard the terms "ADA" and "PHRA," only heard general testimony and evidence about disability discrimination before the Court instructed the jury on both the ADA and the PHRA.[17] (Docket No. 217 at 76:20-24). During the initial *voir dire* and the final charge, the jurors also heard that Plaintiff's claims were based on federal *and* state discrimination laws. Thus, following Third Circuit precedent, the Court finds that apportioning the compensatory damages under the PHRA is both appropriate and consistent with the purpose of both statutes.

Punitive damages are available under the ADA when "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The focus is on the employer's state of mind and requires that "an employer must at least discriminate in the face of a perceived risk that its actions will

---

[16]    The Court acknowledges that Plaintiff did not reference the PHRA in his opening. (Docket No. 211 at 49-64).

[17]    In part, the jury was specifically instructed that "[i]n making his claims, [Gucker] is relying on a Federal law known as the Americans with Disabilities Act, which will be referred to in these instructions as the ADA, and the Pennsylvania Human Relations Act, known as the PHRA." (Docket No. 217 at 76:20-23).

violate federal law." *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535–36 (1999); *see also*

*Gagliardo,* 311 F.3d at 573.  The Court instructed the jury that it:[18]

> may award punitive damages to punish a defendant, or to deter the defendant and others like the defendant from committing such conduct in the future.
>
> Where appropriate, the jury may award punitive damages even if the plaintiff suffered no actual injury, and so received nominal rather than compensatory damages.
>
> An award of punitive damages is permissible in this case only if you find by a preponderance of the evidence that a management official of U. S. Steel personally acted with malice or reckless indifference to Mr. Gucker's federally protected rights.
>
> An action is with malice if a person knows that it violates the federal law prohibiting discrimination and does it anyway. An action is with reckless indifference if taken with knowledge that it may violate the law.

(Docket No. 218 at 183:11-184:1).  The jury thereafter awarded substantial punitive damages

based upon its assessment of Defendant's conduct.

To this end, the jury had the following evidence to consider:

- Numerous physicians, including Dr. Katz, having cleared Plaintiff to return to full duty;

- The fact that Plaintiff worked his first day for approximately five (5) hours without incident;

- Hubert's reaction to Plaintiff's restrictions in spite of Plaintiff's well-established history of working with same and the previous provision of a special parking space by Defendant;

- Hubert's similar treatment of Timmy Hopes upon learning of his restrictions;

- The results of the functional capacity evaluation ("FCE") performed by Kerestan despite knowledge that Plaintiff had not yet taken his heart medication;

---

[18]    U.S. Steel contested the jury instructions on punitive damages.  (Docket No. 217 at 118-28).  Specifically, U.S. Steel contended that there was no evidence of malice, reckless indifference, or intentional conduct.  (Docket No. 217 at 118:25-119:3).

- Dr. Katz admitted Plaintiff's pulse was 78 or 80 at the time of his earlier examination;

- The FCE was based upon a job description never before used by Defendant;

- The testimony of Labor Relations Representative Coulter to the effect that Hubert determined that he would no longer accept Plaintiff's restrictions, although Ligman had no issues with the restrictions either before or after Plaintiff's surgery;

- Coulter believed that Hubert's conduct was a violation of Defendant's policy, and that Defendant took no action to accommodate Plaintiff after Hubert rejected Plaintiff's restrictions;

- Coulter's testimony that Defendant had posted a job opening for Plaintiff's position;

- Coulter's testimony to the effect that Plaintiff's retirement was not really presented to him as a choice;

- The admission by Marcin that the situation could have been handled more appropriately;

- Plaintiff's testimony that he was escorted from the premises by security on his first day back;

- Plaintiff was never interviewed by Coulter or Marcin regarding his restrictions or interaction with Hubert;

- Defendant denied S&A and contested Plaintiff's request for unemployment compensation benefits;

- Defendant's financial worth.

There was also testimony by Plaintiff and his wife regarding his loss of close relationships and sense of community as a result of his perceived termination, as well as the stress, anxiety, and shame that followed – conditions which required Plaintiff to seek medical care and begin taking Lexapro and Buspirone in 2012 after six years without said medications.[19] Altogether, the jury weighed the evidence, determined credibility, and proceeded in a rational fashion to award punitive damages.  The Court will not disturb their determination, here.  The Court will, therefore, award punitive damages under the ADA up to the statutory cap.

To the extent Defendant attacks the jury's determination because the Court did not instruct the jury with respect to the ADA's statutory cap, the Court will afford Defendant no relief.  42 U.S.C. § 1981a states, in relevant part, that:

> If a complaining party seeks compensatory or punitive damages under this section—
>
> (1) any party may demand a trial by jury; and
> (2) the court shall not inform the jury of the limitations described in subsection (b)(3) of this section.

42 U.S.C. § 1981a(c).  As already noted, the parties agreed upon the format of the final charge to the jury, the final charge referenced both the ADA and the PHRA, and the jury had the benefit of reviewing hard copies of the final charge and verdict slip during their deliberations.  The jury was fully aware that the damages could be awarded under both the ADA and the PHRA.   As such, the Court's Order of August 26, 2016 (Docket No. 249) apportioning Plaintiff's damages was appropriate.

## IV.   CONCLUSION

Based upon the foregoing, Defendant's Motion to Mold the Verdict to Conform to the Statutory Cap was granted, in part, and denied, in part, such that the verdict was molded to fit the

---

[19]      Plaintiff was previously provided medical treatment and medication because of family issues, including the death of his former fiancée due to cancer.

damages recoverable under each statute.   The compensatory damages award is $550,000.00, allocated entirely to the PHRA claim, and the punitive damages award is $300,000.00, allocated entirely to the ADA claim.


_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Date:   August 31, 2016
cc/ecf:  All counsel of record.